# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TKO ENERGY SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-108-GKF-PJC |
| | ) | |
| M-I L.L.C., a Delaware limited liability | ) | |
| company, d/b/a M-I Swaco, d/b/a Federal | ) | |
| Wholesale Drilling Mud, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the court on defendant's Motion to Dismiss Plaintiff's First Amended Complaint. (Doc. #19). Because the motion to dismiss challenges the sufficiency of TKO's complaint, all factual allegations are taken as true for purposes of this Order only.

### I.   Legal Standard

Federal Rule of Civil Procedure 8(a) requires a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 does not require detailed factual allegations, but does require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Naked assertions devoid of "factual enhancement" do not suffice. *Id.* And the court need not accept conclusory allegations as true. *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility requirement does "not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal [conduct]." *Id.* at 556. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). The court must determine "whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007).

Accepting the non-conclusory allegations as true, they must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.

## II.   <u>Background</u>

Plaintiff TKO Energy Services alleges defendant M-I L.L.C. ("M-I") used its dominant position in the retail and wholesale drilling fluids market in the Southern Mid-Continent Region to maintain and/or achieve monopolistic power in violation of Section 2 of the Sherman Act.

### A.  The Drilling Fluids Market

M-I is both a retailer and wholesaler of drilling fluids. Compl. ¶5 (Doc. #12). Drilling fluids are used in oil and gas wells to "facilitate the drilling process." *Id.* ¶6. Drilling fluids are created by adding bentonite, barite, caustic soda, and sodium carbonate with water, oil or synthetics. *Id.* ¶11. Two companies – M-I and Baroid Industrial Drilling Products – largely control the mining and production of bentonite and barite. *Id.* ¶12.

M-I sells drilling fluids on a wholesale basis to other drilling fluid services companies, including TKO. *Id.* Because M-I sells wholesale to TKO and sells retail to oil and gas companies, TKO and M-I are competitors. *Id.* ¶10.

M-I's former parent company, M-I Drilling Fluids, was previously subject to antitrust restrictions due to possible anticompetitive effects of a merger between Dresser Industries, Inc. and Baroid Corporation. The United States filed a civil complaint in 1993 to block the proposed merger, and the Final Judgment required Dresser to sell off its interest in M-I Drilling Fluids before the merger could occur. *Id.* ¶14. Smith acquired M-I Drilling Fluids subject to a condition that Smith could not sell or merge M-I Drilling Fluids with certain other companies, including Schlumberger. In 1999, defendant M-I was created as a joint venture between Smith (60% owner) and Schlumberger (40% owner). *Id.* ¶15. The DOJ brought criminal contempt charges against Smith and Schlumberger for violating the order not to sell or merge M-I Drilling Fluids to or with Schlumberger. *Id.* Smith and Schlumberger were found in criminal contempt for violating the Final Judgment, subjecting them to $15 million in disgorgement of profits and fines. *Id.* The Final Judgment was in effect until 2006. *Id.* ¶14 n. 1. After it lapsed, Schlumberger purchased Smith in August 2010. *Id.* ¶17. And TKO claims the alleged anti-competitive activity at issue in this lawsuit began in the Fall of 2010. *Id.*

### B.  The Relationship Between TKO and M-I d/b/a Federal Wholesale Drilling Mud

TKO was established in January 2010. *Id.* ¶18. TKO contacted M-I d/b/a Federal Wholesale Drilling Mud ("Federal") in February 2010 to obtain pricing and terms for wholesale purchase of drilling fluids. TKO filled out a credit application and Federal informed TKO it could receive wholesale drilling fluid under "net 30" terms. *Id.* "Net 30" terms permit delivery of materials up front, followed by TKO paying within 30 days after receiving Federal's invoice. *Id.* ¶21. As TKO's business grew, its orders increased. *Id.* ¶22.

At some point, Federal issued materially incorrect invoices to TKO. *Id.* ¶23. Federal did not deliver all ordered materials. *Id.* And Federal failed to properly credit TKO for returned delivery pallets and returned, unused product. *Id.* TKO paid the incorrect invoices less the

amounts they thought were erroneously charged or not credited – a practice referred to as "short pay." *Id.*

Further invoicing and order problems occurred. *Id.* ¶¶25-43. Federal's inability to reliably meet TKO's orders threatened TKO's business model. *Id.* ¶26. TKO alleges Federal provided higher quality products to its own retail division – M-I Swaco – while providing damaged goods to TKO. *Id.* ¶27. In April 2011, Federal increased its prices. *Id.* ¶28. Communication breakdowns led to situations in which one Federal employee assured TKO that a "short pay" would suffice while another employee would state that short payments might threaten TKO's credit standing with Federal. *Id.* Eventually, Federal began to threaten a credit hold if TKO did not pay the amounts Federal claimed it was owed. *Id.* ¶29. A credit hold would have been disastrous for TKO. *Id.*

The business relationship continued to spiral downward. Federal delivered order forms on several occasions to one of TKO's customers that revealed what TKO was paying for the wholesale drilling fluid it then resold to the customer. *Id.* ¶30. In January 2012, Federal again increased its prices. *Id.* ¶31. On January 23, 2012, Federal sent TKO an email indicating TKO owed over $125,000, and stated that if the funds were not provided overnight Federal would place TKO on a credit hold. *Id.* ¶32. Federal also informed TKO that it had never been "formally approved" for credit and would need to finish a credit application that day to avoid a credit hold. *Id.* ¶32. TKO completed the credit application and paid two invoices it claims it had not previously received. *Id.* ¶35. On February 20, 2012, Federal emailed TKO, asking about an allegedly unpaid invoice from December 2011 and informing TKO that a credit conference concerning TKO was going to occur the next day. *Id.* ¶37.

On February 21, 2012, Federal put TKO on a credit hold and refused to tell TKO why. *Id.* ¶38. That same afternoon, a different Federal employee, Linda Norvell, provided TKO with a statement showing allegedly past due balances and stated that "I am still working on a credit limit for your account as your account was never formally approved. I need your balance cleared up immediately to move forward with this." *Id.* ¶39. TKO provided a response that detailed how the requested balances were false. *Id.* ¶41. On February 22, 2012, Ms. Norvell responded that TKO would have to pay "cash in advance" prior to orders being placed. *Id.* ¶42. TKO sought further information from Federal, but Federal did not respond. *Id.* ¶43.

### C.  Antitrust Allegations

TKO alleges M-I used threatened and actual limitations on its access to drilling fluids products to attempt to monopolize and further its monopoly over drilling fluids products in the Southern Mid-Continent Region. *Id.* ¶44. Specifically, TKO alleges M-I can drive competitors from the market by forcing retail suppliers of drilling fluids to purchase bentonite, barite and other drilling fluids components from Federal. *Id.* ¶45. M-I can protect M-I Swaco's retail business by driving competitors out of business. *Id.* Thus, M-I's use of "supracompetitive" pricing, its restriction of access to essential products, and its imposition of credit holds on competitors deters competitors to M-I Swaco for supplying drilling fluids products to end users. *Id.* ¶47. TKO claims to have lost customers due to paying M-I's "supracompetitive" prices. *Id.* ¶49.

### III.  <u>Discussion</u>

TKO makes the following legal claims: (1) Sherman Act § 2 – Monopolization; (2) Sherman Act § 2 – Attempted Monopolization; (3) Sherman Act § 2 – Essential Facilities; (4) Fraudulent Misrepresentations; (5) Tortious Interference With Business Relations; and (6) Violation of Oklahoma's Antitrust Law, 79 O.S. § 203.

### A.  TKO Fails To State An Antitrust Claim Under Section 2 Of The Sherman Act.

To state a claim for monopolization, TKO must plead facts to plausibly show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). To state a claim for attempted monopolization, TKO must plead facts to plausibly show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). And an "essential facilities" claim is not an independent claim, but merely a description of one way a monopolist could willfully acquire or maintain monopoly power. *See Four Corners Nephrology Assoc., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1223 (10th Cir. 2009) ("picking an 'epithet' to fix on [the essential facilities] argument may be less illuminating than confronting its substance"); Phillip Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust L.J. 841, 841 (1989) ("[Essential facilities] is less a doctrine than an epithet, indicating some exception to the right to keep one's creations to oneself, but not telling us what those exceptions are."); IIIB Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 772, at 199 (3d ed. 2008) ("'[E]ssential facility' is just an epithet describing the monopolist's situation: the monopolist possesses something the plaintiff wants. It is not an independent tool of analysis; it is only a label....").[1]

---

[1] The court notes that recent Supreme Court decisions have cast doubt on the entire essential facilities doctrine. *Trinko*, 540 U.S. at 411 ("We have never recognized such a doctrine").

TKO adequately pleads that the relevant geographic market is Oklahoma, Texas, and Kansas ("Southern Mid-Continent Region") and the product markets are retail and wholesale drilling fluids. First Am. Compl. ¶¶44-45, 56-58.

       1)  *TKO's Complaint Does Not Allege Facts Sufficient To Show M-I Possesses Monopoly Power In the Relevant Markets*

TKO has not pled *facts* to plausibly show M-I had monopoly power in the relevant markets. TKO states several, broad antitrust legal conclusions without alleging facts to support them. *See id.* ¶¶58 ("M-I has acquired and is maintaining a monopoly in the Drilling Fluids Market"), 58 ("M-I has the power to control prices and exclude competition"), 59 ("Substantial barriers to entry and expansion exist in the Drilling Fluids Market within the Southern Mid-Continent Region."), 61 ("prices in the Drilling Fluids Market within the Southern Mid-Continent Region were higher than they would have been in a competitive market"), 69 ("M-I controls a large percentage of that market"). The court takes the following alleged facts as true:

- The national wholesale and retail drilling fluids market is dominated by two companies: M-I and Baroid Industrial Drilling Products, *id.* ¶12;

- The two companies "largely control" bentonite and barite production, *id.* ¶13;

- The United States required Dresser Industries to divest M-I Drilling Fluids before it merged with Baroid Corporation in 1993 because Dresser and Baroid controlled over 50% of the drilling fluid market, *id.* ¶14; Case No. 93-2621 (D.D.C. 1993);

- Dresser's former interest in M-I Drilling Fluids was purchased by Smith International, *id.* ¶14, defendant M-I L.L.C. is a joint venture between Smith International and Schlumberger, *id.* ¶15, and in August 2010, Schlumberger purchased Smith and thus acquired all of defendant M-I, *id.* ¶17.

These facts alone, even if proven, do not show the possession of monopoly power in the asserted geographic market. TKO does not plead that M-I has a monopoly on bentonite or barite production, only that two companies have a significant market share. TKO does not plead M-I's market share in the Southern Mid-Continent Region or facts that plausibly suggest M-I's market

share is sufficient to enable M-I to exercise monopoly power. TKO does not plead who M-I's competitors are, what market share they control, or how M-I could eliminate competition with those competitors. If this were the only deficiency with plaintiff's antitrust claims, the court would grant leave to permit a Second Amended Complaint with more specific factual allegations; however, the issues discussed below preclude plaintiff from being able to state an antitrust claim here.

2)   *TKO's Complaint Does Not Allege Facts Sufficient To Show M-I Willfully Acquired or Maintained A Monopoly Using Anticompetitive Means*

M-I generally has no obligation to deal with TKO at all, much less on price and other terms agreeable to TKO. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Even monopolists are not generally obligated to deal with a rival:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing-a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion.

*Trinko*, 540 U.S. at 407-08; *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) (Posner, J.) ("it is clear that a firm with lawful monopoly power has no general duty to help its competitors"). Nonetheless, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408.

Therefore, TKO must plead facts that, if proven, would show M-I was required to provide its drilling fluids to a competitor. The Supreme Court has been "very cautious" in finding such exceptions because "of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.* The "outer bound" of §2 liability based on refusal to cooperate with a rival is described in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985).

> The Court there found significance in the defendant's decision to cease participation in a cooperative venture. The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent.

*Trinko*, 540 U.S. at 409 (citations omitted).

In *Aspen Skiing*, a monopolist in downhill skiing services in Aspen, Colorado who owned three skiing areas had partnered with the only remaining rival Aspen ski area to offer an "all-Aspen" pass that permitted skiers to visit any of the Aspen resorts. *Aspen Skiing Co.*, 472 U.S. at 587-94. During the mid-1970s, proceeds were distributed based on a survey of actual usage among the four areas, which fluctuated between 13.2% and 18.5%. *Id.* at 590. The monopolist then offered to continue the all-Aspen pass if the competitor accepted a fixed 13.2% share. *Id.* at 591. The two companies eventually agreed to a fixed 15% for the 1977-1978 season. *Id.* at 592. The next season, the monopolist offered to continue the arrangement only if the competitor accepted a fixed 12.5% share. A board member of the monopolist informed an officer of the competitor that he had recommended making the competitor "an offer that [it] could not accept." *Id.* Around the same time, the monopolist began offering a 3-area pass that covered only its mountains. *Id.* at 591-93. The monopolist refused to sell its competitor any lift tickets at the tour operators' discount or even at retail prices. *Id.* at 593. The competitor offered a 3-day pass for its

mountain along with three vouchers guaranteed by funds on deposit at a local bank, but the monopolist refused to accept the vouchers. *Id.* at 594.

A jury found the monopolist liable for violating §2 of the Sherman Act. *Id.* at 600. The Supreme Court affirmed the jury verdict, noting that while a monopolist has "no duty to cooperate with its business rivals," the decision to end a "particular cooperative venture" may have "evidentiary significance" for finding §2 liability. *Id.* at 600-01. The Court found that the monopolist's decision to upend a "pattern of distribution" that originated in a competitive market provided some evidence that the monopolist was trying to change the "character of the market." *Id.* at 603-04. The Court ultimately found that "the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Id.* at 610.

The alleged facts here, if proven, do not state a claim within the outer bounds of *Aspen Skiing*. TKO's conclusory allegations of motive are not facts entitled to the assumption of truth. *Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). While the First Amended Complaint is peppered with legal conclusions, many lack factual allegations to support them. *See, e.g.*, First Am. Compl. ¶¶23 ("This conduct was intentional, and committed by defendant with the specific intent of impairing the operations of plaintiff."), 25 ("invoicing issues were merely a pretext for M-I's efforts to drive TKO out of the drilling fluids market"), 27 ("Upon information and belief, the damaged products were provided to TKO intentionally to cause it competitive harm."), 31 ("Federal's pretextual 'credit holds,' coupled with its complete unresponsiveness, makes it apparent that the scheme was designed for improper anticompetitive

purposes"), 52 ("M-I's tortious conduct is without valid business justification and is intended to remove TKO as a competitor in the drilling fluid market.").

After "identifying the allegations in the complaint that are not entitled to the assumption of truth," the court considers the "factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 680-81. The detailed facts surrounding ongoing contract disputes between TKO and M-I illustrate a somewhat typical business relationship gone sour. First Am. Compl. ¶¶18-43. TKO alleges M-I's subsidiary issued "materially incorrect invoices," failed to deliver promised materials, delivered damaged products, did not credit TKO for unused product, increased prices, revealed the price TKO paid for M-I's product to a TKO customer, required TKO to fill out paperwork to order on credit, and placed TKO on a credit hold. *Id.* ¶¶23, 27, 28, 30, 31, 32, 38. TKO at times short paid M-I's invoices – *i.e.* "pay the invoices less the amounts that were erroneously charged or not credited." *Id.* ¶23. And eventually, M-I's subsidiary required TKO to pay cash in advance before placing an order. *Id.* ¶42.

 "[W]ithout further factual enhancement [the complaint] stops short of the line between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). The facts alleged could possibly show anticompetitive targeting by M-I to monopolize the retail drilling fluids market in the relevant region. But they cannot plausibly do so.

First, M-I never had to deal with TKO in the first place. And the business relationship is new enough that M-I's shifting demands do not upend a "pattern of distribution" that originated in a competitive market. *Cf. Aspen Skiing* at 603-04; *see also Olympia Equip.*, 797 F.2d at 376 (Posner, J.) ("If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability? We think not."); *see also*

*Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1196 (10th Cir. 2009) ("plaintiff argues primarily that, having allowed third parties to engage in the ski rental business for almost fifteen years, [defendant] violated § 2 of the Sherman Act when it revoked that permission and took over the ski rental business for itself. We do not see the logic in this argument."). M-I could entirely refuse to sell to TKO without violating the Sherman Act.

Second, if TKO is correct that M-I has a monopoly over barite and bentonite, then drilling fluid retail customers will be paying the monopoly price regardless of whether TKO serves as an intermediary. *Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). A vertically integrated company with a monopoly over an input – barite or bentonite here – can charge a monopoly price over the final product – drilling fluids. And selling the input at monopoly price to an intermediary that then sells the final product would not lower the ultimate price. Thus, the barite or bentonite monopoly will lead to monopoly prices regardless of whether TKO succeeds or fails. IIIB Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 771b, at 195 (3d ed. 2008) ("consumers are no better off when a monopoly is shared; ordinarily, price and output are the same as they were when one monopolist used the input alone"). While a competitor may be harmed, competition will not.

Therefore, TKO cannot show competition has been harmed because M-I has no obligation to deal with TKO and any relief granted would not change the underlying competitive concern that barite and bentonite production are allegedly controlled by two companies. Judge Posner described this situation well:

> So if a firm went to a monopolist and said, "Please—for the sake of competition—give me a loan so I can compete with you and make this a competitive market," and it was turned down, it could not invoke the Sherman Act. A monopolist has no duty to reduce its prices in order to help consumers,

- 12 -

> *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 603 F.2d at 294, and no duty to
> extend a helping hand to new entrants.

*Olympia Equip.*, 797 F.2d at 376. Plaintiff fails to state an antitrust claim upon which relief could

be granted.

### B.  Fraudulent Misrepresentations

Fed. R. Civ. P. 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the
> circumstances constituting fraud or mistake. Malice, intent, knowledge, and other
> conditions of a person's mind may be alleged generally.

Rule 9(b)'s purpose "is to afford defendant fair notice of plaintiff's claims and the factual

ground upon which [they] are based." *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1236 (10th Cir.

2000) (internal quotations and citations omitted). The Tenth Circuit "requires a complaint

alleging fraud to set forth the time, place and contents of the false representation, the identity of

the party making the false statements and the consequences thereof." *Id.* (internal quotations and

citations omitted). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what,

when, where and how' of the alleged fraud, and [she] must set forth the time, place, and contents

of the false representation, the identity of the party making the false statements and the

consequences thereof." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d

702, 726-27 (10th Cir. 2006). Rule 9(b)'s particularity requirement, however, is not absolute or

limitless; a plaintiff need not go so far as to give the defendant a 'pretrial memorandum

containing all the evidentiary support for plaintiff's case." *Schrag v. Dinges,* 788 F.Supp. 1543,

1550 (D. Kan. 1992) (citation omitted).

Under Oklahoma law, the elements of actionable fraud are: "1) a false material

misrepresentation, 2) made as a positive assertion which is either known to be false or is made

recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4)

which is relied on by the other party to his (or her) own detriment." *Bowman v. Presley,* 212 P.3d 1210, 1218 (Okla. 2009); *see also Schlanger Ins. Trust v. John Hancock Life Ins. (U.S.A, Inc.),* 2012 WL 4324949 (N.D. Okla. Sept. 20, 2012) (quoting *Bowman*, 212 P.3d at 1218).

In reviewing a motion to dismiss pursuant to Rule 9(b), the court must confine its analysis to the text of the complaint, accepting as true all well-pleaded facts as distinguished from conclusory allegations. *Sikkenga,* 472 F.3d at 726. Those facts must be viewed in the light most favorable to the non-moving party. *Id.*

TKO does not allege sufficient well-pleaded facts to state a claim for fraud. TKO alleges the following well-pleaded facts:

- In early 2010, "Federal issued materially incorrect invoices to TKO." First Am. Compl. ¶23.

- In April 2011, Ms. Hubbard of Federal informed TKO it could short pay invoices. After short paying, Federal threatened TKO's credit standing due to the underpayments. *Id.* ¶28. A credit hold would "have disastrous effects on TKO, since it would be unable to meet its client's need for drilling fluid." *Id.* ¶29.

- On February 21, 2012, Ms. Norvell of Federal "misrepresented" that she was working on TKO's credit limit because the account had never been formally approved. *Id.* ¶39. The next day, Ms. Norvell stated that TKO did not have credit and must pay "cash in advance" going forward because TKO had not had credit during the entire relationship between Federal and TKO. *Id.* ¶42.

However, these allegations alone do not sustain a fraud claim under Oklahoma law. Knowingly issuing a materially false invoice could be actionable *if* TKO had relied on the invoice and paid it in full. But TKO states that it paid the invoices "less the amounts that were erroneously charged," therefore, it did not rely on the allegedly false representation. *Id.* ¶23. Similarly, the alleged "bait and switch" by Ms. Hubbard suggests two different Federal employees giving conflicting advice, and does not identify a specific false statement meant to lure TKO into detrimental reliance. *Id.* ¶¶28-29. Finally, the conclusory allegation that Ms. Norvell "misrepresented" that she was working on TKO's unapproved credit application and her

- 14 -

statement that TKO did not have credit do not state a fraud claim. Even if false, the statements did not elicit TKO to take any action, much less a detrimental action. *See id.* ¶39.

The court will permit TKO to file a Second Amended Complaint that may include a fraud claim with particularized allegations. Specifically, the allegations need to identify the specific misrepresentations, who made those misrepresentations, when the misrepresentations were made, and what action TKO took in reliance on those misrepresentations. *Contra id.* ¶29 ("Federal would assure TKO that it could short pay an improper invoice, and then Federal would use the short payments as a basis for threatening a 'credit hold' if TKO did not immediately pay as Federal demanded").

### C.  TKO Fails To State A Claim For Tortious Interference With Business Relations

Oklahoma recognizes a claims for malicious interference with business relations. The elements of malicious interference are: "1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damage proximately sustained as a result of the interference." *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1165 (Okla. 2009). Malice is defined as "an unreasonable and wrongful act done intentionally, without just cause or excuse. This element clearly requires a showing of bad faith." *Id.*[2] The intentional interference must be "directed at the business relationship between [plaintiff] and some third party." *Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip.*, 919 P.2d 443, 447 (Okla. Civ. App. 1994); *see also Ray v. Am. Nat. Bank & Trust Co. of Sapulpa*, 894 P.2d 1056, 1060 (Okla. 1994) ("A cause of action for wrongful interference with

---

[2] Oklahoma does not recognize a separate claim for tortious interference that does not require a showing a bad faith. *Tuffy's, Inc.*, 212 P.3d at 1165 ("The terms 'malicious interference,' 'intentional interference,' and 'tortious interference' with contract or business relations have been used interchangeably in Oklahoma jurisprudence, and do not designate distinct torts").

contract can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms.").

First, on several occasions, Federal provided TKO's customer a copy of TKO's order form that included the wholesale price Federal charged TKO. First Am. Compl. ¶30. TKO alleges Federal instructed the truck driver to provide a copy of the order and that revealing the wholesale price harmed TKO. *Id.* However, TKO does not state that the customer changed providers or took any action after receiving the order form. TKO, thus, does not allege "damage proximately sustained as a result of the interference." *Tuffy's, Inc.*, 212 P.3d at 1165.

Second, TKO alleges Federal purposefully failed to provide product supply needed to satisfy TKO's customers and, at times, provided damaged products. First Am. Compl. ¶¶26-27. TKO alleges Federal did so to interfere with TKO's operations and harm TKO's business and help Federal's corporate sister, M-I Swaco. *Id.* But TKO does not state which customers it lost or damages it sustained due to inadequate or damaged product. Instead TKO claims injury only due to "supracompetitive prices." *Id.* ¶¶49, 91.

Finally, TKO alleges Federal charged wholesale prices higher than a hypothetical competitive market would sustain for its product, and those high prices harmed TKO's ability to keep its retail customers. *Id.* Because Federal could charge whatever prices it wanted and Federal alleges no facts to support its claim that the prices are "supracompetitive," *see supra* § III.A.2), those prices cannot sustain a malicious interference claim.

Therefore, TKO fails to state a claim for malicious or tortious interference. The court will permit TKO to file a Second Amended Complaint that may include a tortious interference claim with sufficient factual allegations. Those allegations should identify the malicious actions alleged and the damages proximately caused due to those malicious actions.

**D.  Violation of Oklahoma's Antitrust Law, 79 Okla. Stat. § 203**

The Oklahoma Antitrust Reform Act must be "interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 et seq. and the case law applicable thereto." 79 Okla. Stat. § 212. "The Court will therefore conflate its discussion of Plaintiff['s] antitrust claims, with the understanding that such discussion applies to both the federal and state claims." *Cohlmia v. Ardent Health Services, LLC*, 448 F. Supp. 2d 1253, 1263 (N.D. Okla. 2006). Therefore, because plaintiff failed to state a federal antitrust claim, it cannot state a state antitrust claim.

**IV.   Conclusion**

WHEREFORE, the Motion to Dismiss Plaintiff's First Amended Complaint (Doc. #19) is granted. Plaintiff TKO is permitted to file a Second Amended Complaint by March 22, 2013 alleging fraud and malicious interference in business relations with sufficient factual allegations and specificity to state a claim upon which relief may be granted. Fed. R. Civ. P. 8(a), 9(b).

DATED this 1st day of March, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT